

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

In re:

**CS DIP, LLC (f/k/a Church Street Health Management, LLC), SSHC DIP, LLC (f/k/a Small Smiles Holding Company, LLC), and FNY DIP, LLC (f/k/a FORBA NY, LLC),**

*Debtors.*

Case No. 3:12-bk-01573
Case No. 3:12-bk-01574
Case No. 3:12-bk-01575

(Jointly administered under
Case No. 12-01573)

Chapter 11
Hon. Keith M. Lundin

## MEMORANDUM

Applying *Papas v. Buchwald Capital Advisors, LLC (In re Greektown Holdings, LLC)*, 728 F.3d 567 (6th Cir. 2013), approval of the settlement of National Union Fire Insurance Company's liability in the reorganization of the Small Smiles Dental Clinics is denied in part.

1.      The bankruptcy court has subject matter jurisdiction to review the settlement and to approve an appropriate injunction.

2.  *Stern v. Marshall*[1] is satisfied.

3.  The bankruptcy court has statutory authority to review the settlement and to approve an appropriate injunction.

4.  The proposed injunction is too broad.

5.  The settlement and proposed injunction fail the four-factor test for fairness in *Bard v. Sicherman (In re Bard)*,[2] and fail the fairness review required by *McDannold v. Star Bank, N.A.*[3]

The following are findings of fact and conclusions of law. FED. R. BANKR. P. 7052.

## I. FACTS

### A. Prepetition Debtors

Prior to Chapter 11 filings in February, 2012,[4] the Debtors[5] provided dental practice management services to 67 dental clinics—typically doing business as "Small Smiles"—that served low income families in 22 States. The Debtors assembled this network of pediatric dental clinics in part by acquiring assets owned by members of the DeRose family.[6]

---

[1] __ U.S. __, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011). *See also Wellness Int'l Network, Ltd. v. Sharif*, __ U.S. __, 135 S. Ct. 1932, 191 L. Ed. 2d 911 (2015); *Executive Benefits Ins. Agency v. Arkison*,__ U.S. __, 134 S. Ct. 2165, 189 L. Ed. 2d 83 (2014).

[2] 49 F. App'x 528 (6th Cir. 2002).

[3] 261 F.3d 478 (6th Cir. 2001).

[4] Related debtor cases were filed on February 20 and 21, 2012.

[5] The original Debtors, jointly administered, were Church Street Health Management, LLC n/k/a CS DIP, LLC (Case No. 12-01573), Small Smiles Holding Company, LLC n/k/a SSHC DIP, LLC (Case No. 12-01574), FORBA NY, LLC n/k/a FNY DIP, LLC (Case No. 12-01575), FORBA Services, Inc. n/k/a FS DIP, INC. (Case No. 12-01577), and EEHC, Inc. n/k/a EE DIP, INC. (Case No. 12-01576).

[6] Ex. 4, Amended Proposed Disclosure Statement for Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Proposed By Debtors and the Official Committee of Unsecured Creditors, ECF Doc. 595, at 14.

Investigations of the Debtors begun in 2007 by the U.S. Department of Health and Human Services and the U.S. Department of Justice—with parallel investigations by many state officials—resulted in settlement agreements in 2010. On top of millions spent defending the government actions, the settlement agreements obligated Debtors to pay $24 million and required compliance programs to ensure the quality of care at Small Smiles Dental Clinics.[7]

In addition to the government investigations, former patients filed personal injury, malpractice and fraud actions against the Debtors, clinics and individual dentists ("Patient Claims"). At the petition, 11 lawsuits were pending filed by more than 100 former patients and many additional patients were in various stages of filing or joining suits.

### B. National Union Insurance and the Coverage Case

Small Smiles maintained professional liability insurance policies with National Union Fire Insurance Company. The Debtors, Dental Clinics and many individual dentists were named as insureds or additional insureds.[8] Other policies were issued by other insurance companies—CNA, for example—directly to individual dentists employed at the Dental Clinics. Debtors tendered the patient lawsuits to National Union for defense and indemnity. National Union defended under a reservation of rights to contest coverage.

---

[7] Ex. 4, Amended Proposed Disclosure Statement for Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Proposed By Debtors and the Official Committee of Unsecured Creditors, ECF Doc. 595, at 14-16.

[8] National Union issued these Small Smiles policies: (1) Dentists Liability Policy No. DNU3375848 for the policy period September 26, 2009 to September 26, 2010; (2) Dentists Liability Policy No. DNU3375848 for the policy period September 26, 2008 to September 26, 2009; (3) Dentists Liability Policy No. DNU6360128 for the policy period December 1, 2009 to December 1, 2010; and (4) Dentists Liability Policy No. DNU6360128 for the policy period December 1, 2008 to December 1, 2009. Declaration of Dan B. Lain in Support of Motion of the Liquidating Trustee for Order (A) Approving Settlement with Insurers, (B) Granting an Injunction in Favor of the Insurers, and (C) Approving Trust Distribution Procedures, ECF Doc. 811-3.

On August 5, 2010, National Union sued Debtors in the United States District Court for the Middle District of Tennessee (the "Coverage Case"). National Union sought a declaration that the Small Smiles policies were void or voidable because the insureds failed to disclose material information during the application and underwriting process.

### C. Sale of Debtors' Assets

On May 30, 2012, the Debtors' assets were sold pursuant to § 363 of the Bankruptcy Code. Withheld from that sale were the National Union policies and avoidance actions under Chapter 5 of the Bankruptcy Code. After the sale, National Union sought relief from the stay to litigate the Coverage Case.

### D. Liquidating Plan

Following the sale, a Joint Plan of Reorganization proposed by the Debtors and the Official Committee of Unsecured Creditors was confirmed on March 7, 2013.[9] The Plan created a Liquidating Trust to hold the Debtors' insurance rights and to manage litigation of the Coverage Case. The Liquidating Trust was broadly empowered to compromise, settle, release and obtain the benefits of insurance on behalf of the Debtors, the Dental Clinics, dentists and the Patient Claims. The confirmed plan authorized the Liquidating Trust to identify, resolve and pay Patient Claims. The Plan established a Trust Advisory Committee with authority to veto any settlement of the Coverage Case. Dan B. Lain became Liquidating Trustee.

---

[9] Findings of Fact, Conclusion of Law & Order Confirming Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Proposed by Debtors And the Official Committee of Unsecured Creditors, ECF Doc. 653; Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Proposed by Debtors and the Official Committee of Unsecured Creditors, ECF Doc. 647.

Case 3:12-bk-01573   Doc 863   Filed 10/09/15   Entered 10/09/15 11:43:22   Desc Main
Document     Page 4 of 40

With respect to Patient Claims and claims for contribution or indemnity by dentists, the Plan contained the detailed provisions in Appendix A.

### E. Settlement Agreement

The Liquidating Trust and National Union hammered out a settlement of the Coverage Case. The Settlement Agreement provides that National Union will pay the Liquidating Trust $39,000,000.00. In exchange, the Liquidating Trust will release National Union from all claims under the policies and will sell the policies and coverage rights to National Union. The Settlement Agreement imposes a channeling injunction that directs all Patient Claims to the Liquidating Trust. There is an exception to this channeling injunction for claims against FORBA LLC, FORBA NY LLC, DeRose Management Company, DD Marketing, Inc., Danny DeRose, Edward DeRose, Michael DeRose, William Mueller, Michael Roumph, Richard Lane or Adolph Padula ("Former Owners," discussed below). Material provisions of the Settlement Agreement with respect to the channeling injunction and releases are in Appendix B.

The Settlement Agreement contemplates Trust Distribution Procedures to identify and pay Patient Claims. The Trust Distribution Procedures fix deadlines for submission of Patient Claims which must include "acknowledgment . . . that, upon payment of the Settlement Amount by the Insurers to the Liquidating Trust, any Claims that such Claimant might have been entitled to assert against the Insurers related to Small Smiles Claims are released and that any Small Smiles Claims that such Claimant may assert against any of the Insureds or the Clinic Dentists . . . are non-recourse . . . ."[10]

The Trust Advisory Committee approved the Settlement Agreement.

---

[10]  Ex. 16, Settlement and Release Agreement, ECF Doc. 811-1, at x, § IV.C.

Case 3:12-bk-01573   Doc 863   Filed 10/09/15   Entered 10/09/15 11:43:22   Desc Main
Document    Page 5 of 40

## II. Hearing on Motions to Approve Settlement Agreement and Related Matters

The Liquidating Trustee filed motions to: (A) Approve the Settlement with National Union, (B) Grant an injunction in favor of National Union, (C) Approve trust distribution procedures, and (D) Approve additional notice procedures.[11]

At the June 2, 2015, hearing on these motions,[12] the Liquidating Trustee introduced 21 exhibits, presented the testimony of the Liquidating Trustee and the testimony of David Killalea—an expert on the reasonableness of the settlement amount. The only evidence offered by any other party was the testimony of James Robert Moriarty,[13] called on behalf of Sterling Mustered (see below).

Three legal issues were staged for further briefing: 1) What standards would the Sixth Circuit use to measure the fairness of a post confirmation settlement agreement and channeling injunction in a mass tort case; 2) what choice of law informs the fairness of a settlement that exhausts policy limits when co-insureds object; and, 3) whether *Stern v. Marshall*, ___U.S. ___, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011), limits bankruptcy court authority to finally dispose of the Liquidating Trustee's motions.

---

[11] Motion of the Liquidating Trustee for Order (A) Approving Settlement with Insurers, (B) Granting an Injunction in Favor of The Insurers, and (C) Approving Trust Distribution Procedures, ECF Doc. 811, and Motion of the Liquidating Trustee to Approve Additional Notice Procedures Including Publication of Notice of Approval of Settlement Agreement and Related Injunction, Trust Distribution Procedures and Claim Filing Deadline, ECF Doc. 812. No specific objection was filed to the motion with respect to additional notice procedures.

[12] The Former Owners (see below) moved to continue the June 2, 2015 hearing. The continuance motion was considered at the June 2d hearing, and granted in part. Permission was granted for additional discovery with regard to proof offered by any party and all parties were given time to further develop legal issues in post hearing briefing. At the conclusion of the hearing, all parties confirmed they had presented all available evidence regarding the Settlement Agreement.

[13] Mr. Moriarty was previously a member of the Trust Advisory Committee. Mr. Moriarty resigned from the Trust Advisory Committee over disagreements with the final form of the Settlement Agreement. Moriarty believed that greater burden should be placed on the Liquidating Trust to identify potential victims.

## III.    POSITIONS OF THE PARTIES

Three objections were filed to the Settlement Motions—1) Continental Casualty Company ("CNA"); 2) Former Owners; and, 3) Sterling Mustered, an individual Small Smiles patient. The main sources of controversy are the releases granted National Union, the injunction that will cut off recovery for contribution, indemnity, subrogation and direct claims by co-insureds, and the exclusion of Former Owners from the benefits of the releases and injunction.

### A. CNA

CNA issued professional liability insurance policies to four dentists formerly employed by the Debtors. CNA's insureds were also insured under Debtors' policies with National Union. CNA asserts a right of subrogation against National Union for any claims its insureds could make against National Union.[14]

CNA first argues that the bankruptcy court does not have subject matter jurisdiction to consider the Settlement Agreement insofar as it releases claims between nonsettling, nondebtor parties. Because CNA and its insureds may have state law claims against National Union that the bankruptcy court could not adjudicate, CNA concludes the bankruptcy court cannot approve a settlement that resolves those claims.

Second, CNA asserts the Settlement Agreement releases its subrogation rights against National Union without compensation. To the extent a Clinic Dentist was insured by both CNA and National Union, the Settlement Agreement would extinguish CNA's subrogation rights in that Clinic Dentist's claims against National Union.

---

[14]  Before confirmation, CNA objected to a draft of the plan that extinguished any rights of subrogation that CNA had against National Union. To resolve this objection, the plan was amended to reserve CNA's right to later object to the Liquidating Trust's exercise of authority to settle CNA's claims against National Union.

Case 3:12-bk-01573    Doc 863    Filed 10/09/15    Entered 10/09/15 11:43:22    Desc Main
Document    Page 7 of 40

Third, CNA makes a contract law argument that the Settlement Agreement fails for lack of consideration to CNA for its release of claims against National Union and Debtors.

Finally, CNA objects technically that the Settlement Agreement amends the Confirmed Plan without respect for 11 U.S.C. § 1127. The Settlement Agreement requires Clinic Dentists to provide a sworn statement that they in good faith believe they have coverage under the National Union policies. The Confirmed Plan does not require a sworn statement.

### B. Sterling Mustered

Sterling Mustered, a minor, by next friend, originally challenged final disposition by the bankruptcy court under *Stern v. Marshall*. Mustered withdrew this *Stern* objection in a post hearing submission.[15]

Mustered maintains that the Settlement Agreement fails the standards for review of nondebtor releases and channeling injunctions in *Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*,[16] *McDannold* and in Bankruptcy Rule 9019.

Mustered contends the Settlement Agreement should have been offered in the context of confirmation because the releases and injunction require the special scrutiny that attends plan confirmation.

Finally, Mustered asserts that the Settlement Agreement inappropriately provides class relief when no class has been certified, and none could be certified because of individualized factual and

---

[15] As explained below, the Settlement Agreement does not offend *Stern*. Should an appellate court disagree, these findings and conclusions could be deemed proposed and submitted consistent with 28 U.S.C. § 157(c)(1). *See Executive Benefits Ins. Agency v. Arkison,* __ U.S. __, 134 S. Ct. 2165, 2173, 189 L. Ed. 2d 83 (2014).

[16] 280 F.3d 648 (6th Cir. 2002).

legal issues. Somewhat inconsistently, Mustered suggests appointment of a guardian ad litem to represent Patient Claimants.

### C. Former Owners

Danny DeRose, Edward J. DeRose, Michael A. DeRose, William A. Mueller, Michael W. Roumph, Richard B. Lane and Adolph R. Padula—former owner/operators of Dental Clinics—challenge provisions of the Settlement Agreement that remove them from the definition of "Insureds" under the National Union polices and exclude them from the releases and injunction.

The Former Owners assert they are additional insureds under one or more of the policies issued by National Union.[17] According to the Former Owners, an endorsement modified the schedule of insured parties to include identified dental clinics. Within the coverage period, the Former Owners were members, shareholders, directors or officers of clinics named in the endorsement. As additional insureds, the Former Owners assert rights to defense and indemnification.

The Former Owners argue that the Settlement Agreement is not fair and equitable for purposes of Bankruptcy Rule 9019. They say this case does not present "unusual circumstances" to warrant an injunction against nonconsenting third parties.

As a threshold matter, the Former Owners challenge bankruptcy court jurisdiction to issue the proposed injunction—especially to the extent the injunction would preclude bad faith claims against National Union. The court's "duty to determine whether a proposed Rule 9019 settlement is fair and equitable does not give the bankruptcy court jurisdiction over settlement condition[s] that

---

[17] National Union previously agreed to defend Dr. Padula under a reservation of rights in several pending civil actions.

do not bear on the court's duties to preserve the estate and protect creditors."[18] If the bankruptcy court has jurisdiction to enter this sort of injunction, the Former Owners contend the proposed injunction exceeds the boundaries in Sixth Circuit precedent. This injunction is not "narrowly tailored and fair" to nonsettling parties because the injunction and exclusion of Former Owners from the scope of insureds would preclude all actions against National Union.

### D. Liquidating Trustee

The Liquidating Trustee responds that the Settlement Agreement should be approved because: 1) the probability of success in the Coverage Case is uncertain; 2) the Coverage Case is complicated and will require great expense to litigate; and, 3) the Settlement Agreement is a reasonable resolution of the Coverage Case that provides a significant compensation pool for Patient Claims. If National Union succeeds on its rescission claims, coverage would be eliminated and Patient Claimants would receive nothing. Even if the Liquidating Trust prevails in the Coverage Case, the amount of recovery is speculative. The Liquidating Trustee anticipates further litigation measured in years and enormous additional expense.

The Liquidating Trustee asserts that the proposed releases and injunction implement the Confirmed Plan:

> The Plan authorized the Trust to manage and settle the National Union policies in exactly the way the Agreement provides. . . . Specifically, the Plan contemplated that the Trust could compromise, settle and release any claims or potential claims by the holders of Patient-Related Claims and the Clinic Dentists against any insurer relating to the Small Smiles Claims, subject only to approval by

---

[18] Memorandum in Support of Objection of Danny Derose, Edward J. Derose, Michael A. Derose, William A. Mueller, Michael W. Roumph, Richard B. Lane and Adolph R. Padula to Motion of the Liquidating Trustee for Order (A) Approving Settlement with Insurers, (B) Granting an Injunction in Favor of the Insurers, and (C) Approving Trust Distribution Procedures, ECF Doc. 857, at 11.

the Trust Advisory Committee and the Bankruptcy Court after notice and hearing. . . .

The injunction sought by the Settlement Motion is merely an enforcement mechanism for the releases and other terms of the Agreement. The injunction removes no additional rights; it merely limits each of these parties' ability to act inconsistently with the terms of the Plan and the Agreement. There are no rights that are impaired by the injunction that were not previously limited by the Plan, and the injunction is properly limited in scope.[19]

With respect to the Former Owners, the Liquidating Trustee says this:

While the Owner-Objectors would no longer receive defense or indemnity rights under the Entities Policies following approval of the Agreement, they would still benefit from the Agreement. Owner-Objectors will benefit because Owner-Objectors' potential liabilities will be reduced by the Liquidating Trust's payments to certain Claimants. Specifically, to the extent a Claimant recovers from the Liquidating Trust and then later brings a claim against Owner-Objectors, Owner-Objectors will be entitled to seek a set-off to reduce their obligations by the amount that Claimant received from the Liquidating Trust. While the payments to Claimants resulting from the Agreement may not be sufficient to fully satisfy Claimants' demands, the payment will unquestionably reduce the claims that might subsequently be asserted against Owner-objectors.[20]

In his post hearing brief, the Liquidating Trustee argues for the first time that the Former Owners have no rights under the National Union policies, that they were not insureds, that the coverage period for the policies does not include the time the Former Owners were associated with the Dental Clinics and that Dr. Padula is estopped to claim coverage.[21] To the extent the Former

---

[19] Post-hearing Memorandum in Support of the Motion of The Liquidating Trustee for Order (A) Approving Settlement With Insurers, (B) Granting an Injunction in Favor of The Insurers, and (C) Approving Trust Distribution Procedures, ECF Doc. 859, at 11-12.

[20] Reply to the Objection of Danny DeRose, Edward J. DeRose, Michael A. DeRose, William A. Mueller, Michael W. Roumph, Richard B. Lane and Adolph R. Padula to Motion of the Liquidating Trustee for Order (A) Approving Settlement with Insurers, (B) Granting an Injunction in Favor of the Insurers, and (C) Approving Trust Distribution Procedures, ECF Doc. 845, at 6-7.

[21] This late-coming challenge is odd. The policy exhibited by the Liquidating Trustee does not exclude Former Owners from coverage. The retroactive date for claims made coverage is stated as 02/01/2001. Two endorsements list "Named Insureds" and "Additional Insureds." Adolph Padula is listed individually as an insured. The additional insureds endorsement includes a list of corporations and LLCs, with respect to which Former Owners assert membership, shareholder, officer or director relationships between the retroactive date and 2006. *See* Ex. 9, Attachment 1, National Union Fire Ins. Co. of Pittsburgh, PA, Dentists Liability Policy, No. DNU3375848.

Owners and CNA have any rights under the policies, the Liquidating Trustee asserts those rights are

protected and compensated:

> To the extent that CNA is entitled to adequate protection for claims it may be
> subrogated to against Dental Clinics or Clinic Dentists, CNA will receive a credit
> compensation for any amounts paid to the plaintiff, the Patient-Related Claim
> holder. . . . This credit against liability is exactly the type of compensation that the
> Sixth Circuit [has] described as typical and appropriate when a Court impairs
> contribution rights.
>
>      * * * *
>
> To the extent that the Owners-Objectors are entitled to compensation as a
> result of the Agreement, . . . [they] received significant compensation in connection
> with the Plan confirmation. The National Union policies were the subject of
> exhaustive litigation over National Union's rescission claims. Through the Trust's
> litigation and settlement efforts, the Trust has been able to obtain a substantial
> settlement payment that would not have otherwise existed. Because the Agreement
> provides holders of Patient-Related Claims with a means of recovery, the Agreement
> will reduce damage claims by these claimants that otherwise would likely be asserted
> against the Owners-Objectors by holders of Patient-Related Claims.[22]

## IV. DISCUSSION

### A. The Rules

In *Papas v. Buchwald Capital Advisors, LLC (In re Greektown Holdings, LLC)*, 728 F.3d

567, 577 (6th Cir. 2013), the Sixth Circuit considered a post confirmation settlement agreement that

enjoined claims of nonsettling defendants against nondebtor third parties. The panel considered Sixth

Circuit precedent with respect to Chapter 11 plans and channeling injunctions and found all the cases

lacking.

---

[22] Post-hearing Memorandum in Support of the Motion of The Liquidating Trustee, ECF Doc. 859 at 12-15.

First, *Greektown Holdings* rejected application of the seven factor "unusual circumstances" test developed in *Dow Corning*[23] because *Greektown Holdings* presented an injunction "entered in connection with a settlement agreement long after the plan of reorganization was confirmed . . . [rather than] an injunction incorporated into a plan of reorganization." *Greektown Holdings* next rejected the usual standards for review of bankruptcy settlements under Bankruptcy Rule 9019 as applied in *Bard v. Sicherman (In re Bard)*, 49 F. App'x 528 (6th Cir. 2002) (per curiam), because no party in *Greektown Holdings* objected to the fairness of the settlement. Finally, *Greektown Holdings* rejected the fairness determination in *McDannold v. Star Bank, N.A.*, 261 F.3d 478 (6th Cir. 2001), because there was no right of contribution the elimination of which required a fairness determination. The *Greektown Holdings* panel then set a new course for review of postconfirmation settlements that include third-party injunctions.

In the post confirmation world, *Greektown Holdings* instructs the reviewing court to first determine whether it has jurisdiction to enjoin the claims that would be subject to a bar order or injunction. *In re Greektown Holdings, LLC*, 728 F.3d at 577. Second, the court must determine if it has power to enter the proposed injunction. *In re Greektown Holdings, LLC*, 728 F.3d at 578. Third, the reviewing court must "closely scrutinize the bar orders's scope." *In re Greektown Holdings, LLC*, 728 F.3d at 578-79.

Implicit in *Greektown Holdings*, when the fairness of a postconfirmation settlement is challenged, Bankruptcy Rule 9019 is in play and *Bard* factors are considered. Similarly, when contribution rights are impacted by a proposed release or injunction, examination of fairness under

---

[23] *Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 656 (6th Cir. 2002).

*McDannold* is required. Here, in contrast to *Greektown Holdings,* objecting parties challenge the fairness of the Settlement Agreement and contribution rights are at issue. Accordingly, *Greektown Holdings* imposes a daunting multi-part test (with parts within parts) to determine whether the Small Smiles Settlement Agreement and injunction have legs.

### B. Jurisdiction

"The jurisdiction of the bankruptcy courts, like that of all federal courts, is grounded in, and limited by, statute." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307, 115 S. Ct. 1493, 131 L. Ed. 2d 403 (1995). Bankruptcy courts source jurisdiction derivatively in 28 U.S.C. § 1334. District courts are granted "jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b).

"Where a bankruptcy court is asked to adjudicate matters between non-debtor parties, the court's 'related-to' jurisdiction must necessarily be invoked." *In re Arter & Hadden, LLP*, 373 B.R. 31, 35 (Bankr. N.D. Ohio 2007) (citing *Feld v. Zale Corp.*, 62 F.3d 746 (5th Cir. 1995)). "Related to" jurisdiction is broadly conceived by the Sixth Circuit. *In re Greektown Holdings, LLC*, 728 F.3d at 577 (citing *Celotex Corp. v. Edwards*, 514 U.S. at 307–08). "'[T]he test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.'" *Lindsey v. O'Brien, Tanski, Tanzer & Young Health Care Providers of Conn. (In re Dow Corning Corp.)*, 86 F.3d 482, 489 (6th Cir. 1996) (citation omitted). "An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *In re Dow Corning Corp.*, 86 F.3d at 489 (internal quotations and citation omitted).

"'[T]here must be some nexus between the 'related' civil proceeding and the title 11 case.'" *Greektown Holdings, LLC*, 728 F.3d at 578 (quoting *In re Dow Corning Corp.*, 86 F.3d at 489 (internal quotation omitted)). "A bankruptcy court may have related jurisdiction over a third-party dispute where 'the subject of the third-party dispute is property of the estate, or because the dispute over the asset would have an effect on the estate.'" *In re Arter & Hadden, LLC*, 373 B.R. at 35 (quoting *In re Zale Corp.*, 62 F.3d at 753). *See also Michigan Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1143 (6th Cir. 1991) (third-party action is "related to" bankruptcy when confirmed plan provided for indemnification of creditor).

In *Greektown Holdings*, the Sixth Circuit ruminated that "[a]t the most literal level, it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute because the debtor's estate ceases to exist once confirmation has occurred.'" *In re Greektown Holdings, LLC*, 728 F.3d at 577 (quoting *Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 165 (3d Cir. 2004)). Retreating a bit from literality, "[i]t is possible that a bankruptcy court's 'related to' jurisdiction diminishes somewhat post-confirmation. . . . The 'related to' inquiry asks not whether the *assertion* of the claims would effect [*sic*] the bankruptcy estate but whether the *outcome* of the claims would effect [*sic*] the estate. Furthermore, the 'related to' inquiry asks not whether there is a nexus between the other proceeding and the *settlement agreement* but whether there is a nexus between the other proceeding and the *bankruptcy case*." *In re Greektown Holdings, LLC*, 728 F.3d at 577-78 (citations omitted). The Sixth Circuit applauded the "better approach" in *In re Zale*

Case 3:12-bk-01573   Doc 863   Filed 10/09/15   Entered 10/09/15 11:43:22   Desc Main
Document     Page 15 of 40

*Corp.*:[24] "In *Feld* the Fifth Circuit inquired simply whether the outcome of the actions covered by the bar order would affect the bankruptcy estate."[25]

The National Union insurance policies were property of the Small Smiles bankruptcy estates and became assets of the Liquidating Trust through the confirmed plan.[26] Insurance proceeds also became property of the bankruptcy estates when the magnitude of claims against Debtors' insurance threatened to exhaust policy limits.[27]

---

[24]   *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746 (5th Cir. 1995).

[25]   *Greektown Holdings*, 728 F.3d at 578. *See also Craig's Stores of Tex., Inc. v. Bank of La. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 391 (5th Cir. 2001) ("In sum, the state law causes of action asserted by Craig's against the Bank do not bear on the interpretation or execution of the debtor's plan and therefore do not fall within the bankruptcy court's post-confirmation jurisdiction."). The Sixth Circuit's approach draws strength from much authority recognizing bankruptcy court jurisdiction to interpret, enforce and aid in the compliance of prior orders. *See, e.g., Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 129 S. Ct. 2195, 174 L. Ed. 2d 99 (2009) (Bankruptcy court plainly had jurisdiction to interpret and enforce its own prior orders, including plan confirmation order.); *Baker v. Baker (In re Baker)*, 593 F. App'x 416 (5th Cir. 2015) ("'[A]fter a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan.' 'This jurisdiction extends to matters that 'impact compliance with or completion of the reorganization plan.'' A bankruptcy court 'plainly ha[s] jurisdiction to interpret and enforce its own prior orders.'") (internal citations and footnotes omitted); *Wilshire Courtyard v. California Franchise Tax Bd. (In re Wilshire Courtyard)*, 729 F.3d 1279, 1287 (9th Cir. 2013) (Postconfirmation "related-to" bankruptcy jurisdiction exists under the "close nexus" test over "matters 'affecting the 'interpretation, implementation, consummation, execution, or administration of the confirmed plan.''"); *Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 168–69 (3d Cir. 2004) ("[W]here there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan . . . retention of post-confirmation bankruptcy court jurisdiction is normally appropriate.").

[26]   *See, e.g., ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260 (3d Cir. 2006) (citing *Estate of Lellock v. Prudential Ins. Co. of Am.*, 811 F.2d 186, 189 (3d Cir. 1987)); *In re Medex Reg'l Labs., LLC*, 314 B.R. 716, 720 (Bankr. E.D. Tenn. 2004) ("'[A]n overwhelming majority of courts have concluded that liability insurance policies fall within § 541(a)(1)'s definition of estate property.' Nevertheless, the estate's legal or equitable interests cannot rise above that of the Debtor's pre-bankruptcy. . . . [T]he court must analyze the facts of each particular case, focusing primarily upon the terms of the actual policy itself, and '[t]he outcome usually hinges on who is the named insured under the liability insurance policy.'") (internal citations omitted).

[27]   *See Sosebee v. Steadfast Ins. Co.*, 701 F.3d 1012, 1023-24 (5th Cir. 2012) (In the context of "a mass tort action where hundreds or thousands of claims against the debtor's insurer might exhaust insurance proceeds and thus threaten the debtor's estate over and above limits of liability insurance policies have courts held the proceeds of liability insurance policies are property of the bankruptcy estate. *E.g.,* MacArthur Co. v. Johns–Manville Corp., 837 F.2d 89, 92 (2d Cir. 1988), ('Manville's insurance policies and their proceeds were substantial property of the Manville estate which will be diminished if and to the extent that third party direct actions against the insurance carriers result in plaintiffs' judgments.')."); *In re W.R. Grace & Co.*, 475 B.R. 34, 81-2 (D. Del. 2012) ("[T]he general rule followed by most jurisdictions, . . . , that the proceeds of a debtor's liability insurance policies are considered property of its bankruptcy

Resolution of the coverage dispute, dealing with hundreds of Patient Claims, and distribution of insurance proceeds are the essence of these Chapter 11 cases—before and after confirmation. There is no Small Smiles Chapter 11 reorganization absent the outcome the Liquidating Trustee has achieved in the Coverage Case. There was nothing else to reorganize. Resolving the value of the disputed National Union policies and resolving claims against that value are within the core of bankruptcy court jurisdiction.[28]

The jurisdictional question becomes muddled only if the Settlement Agreement or injunction is too broad. *See, e.g., In re Arter & Hadden, LLP*, 373 B.R. at 37 (Bankruptcy court lacked jurisdiction when several provisions of a settlement agreement were "too pervasive and . . . request[ed] relief far in excess of [the] Court's jurisdiction [] where it [sought] to enjoin actions by any person against non-debtor parties."). The Sixth Circuit explained this jurisdictional limitation in *Greektown Holdings* by rejecting the circular approach adopted by the Eleventh Circuit in *Munford v. Munford, Inc. (In re Munford, Inc.)*, 97 F.3d 449 (11th Cir. 1996). In the Eleventh Circuit, "when a defendant in an adversary proceeding conditions its agreement to a settlement upon the entry of a bar order, the claims encompassed by the bar order are necessarily 'related to' the bankruptcy case." *In re Greektown Holdings, LLC*, 728 F.3d at 578. The Sixth Circuit rejected the proposition that parties could confer "related to" jurisdiction by conditioning their agreement to

---

estate.) (citing cases); *In re Equine Oxygen Therapy Resources, Inc.,* No. 14-51611, 2015 WL 1331540, *5 (Bankr. E.D. Ky. Mar. 20, 2015) ("[P]roceeds are estate property, particularly where a debtor's insurance coverage is insufficient to cover the claims against it and exhaustion of available insurance proceeds threatens to expose a debtor's estate to significant excess liability."); *In re Focus Capital, Inc.*, 504 B.R. 296, 304-05 (Bankr. D. N.H. 2014); *In re Salem Baptist Church of Jenkintown*, 455 B.R. 857, 867–68 (Bankr. E.D. Pa. 2011); *Miller v. McDonald (In re World Health Alt., Inc.),* 369 B.R. 805, 810 (Bankr. D. Del. 2007) ("When an insurance policy provides coverage only to the debtor, courts will generally rule that the proceeds are property of the estate.").

[28] 28 U.S.C. § 157(b)(2)(B) & (O).

settle upon entry of an order barring third-party claims. *In re Greektown Holdings, LLC*, 728 F.3d at 578.

The Settlement Agreement steps over the "related to" line in one respect: The settlement includes a bar to all actions—not just contract, indemnity, defense or contribution, but also any direct action against National Union. For example, though perhaps not every state recognizes "bad faith" as an acceptable attack on the fairness of a policy-limits settlement,[29] here the issue is framed differently: Would a bad-faith action or action under state consumer protection statutes[30] by a Clinic Dentist or Former Owner against National Union have a nexus to this postconfirmation bankruptcy case and would the outcome of that lawsuit affect the Small Smiles estates?

Arguably, there is a "nexus" between a hypothetical direct action and the Small Smiles Chapter 11 cases. The predicate to a bad-faith challenge to the Settlement Agreement would be coverage under a National Union policy. Those policies are assets in these cases.

But that nexus produces no proven affect on the postconfirmation estates—the second element required by *Greektown Holdings*. Tender of policy limits would not preclude a bad-faith

---

[29] See below.  *See, e.g., In re September 11 Prop. Damage Litig.*, 650 F.3d 145, 151 (2d Cir. 2011) (citing cases from Texas, Maryland, Georgia, North Carolina and Kansas) ("[U]nder New York State law, an insurer has discretion to settle whenever and with whomever it chooses, provided it does not act in bad faith. . . . Under New York law, an insurer 'has no duty to pay out claims ratably and/or consolidate them,' so long as it does not act in bad faith. An insurer may therefore 'settle with less than all of the claimants under a particular policy even if such settlement exhausts the policy proceeds.'  Such settlements are not 'voluntary' or 'additional insurance,' but rather 'reduc[e] the liability remaining under the policy.'  This has long been the rule across several jurisdictions.") (internal citations omitted); *Travelers Indem. Co. v. Citgo Petroleum Corp.*, 166 F.3d 761, 766 (5th Cir. 1999) ("The insurers in *Vitek* chose to craft a settlement that benefitted one of its insureds—exhausting their policy limits and in the process leaving an exposed co-insured party without coverage under the policy. The district court required the injunction to be extended to the co-insured because it adopted the position Citgo urges, that an insurer cannot favor one insured over another. We rejected this contention, finding that a insurer was free to make such a settlement, although we held open the possibility that a The Texas Supreme Court has since indicated that in such a context an action for breach of good faith against the insurer cannot be maintained.") (citing *Maryland Ins. Co. v. Head Indus. Coatings & Servs., Inc.*, 938 S.W.2d 27, 28 (Tex. 1996)).

[30] *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151, 129 S. Ct. 2195, 174 L. Ed. 2d 99 (2009).

Page 18 of 40

action against National Union. No one has proven that the settlement amount exceeds policy limits because of the extended releases and injunction. Any recovery in a direct action would not reduce National Union's contract obligations to these debtors. Patient Claimants would have no right to share in any recovery a third party might have from National Union for bad-faith. Direct actions do not adjust a debtor-creditor relationship. It seems likely that the Sixth Circuit would not extend bankruptcy court jurisdiction to the proposed bar to direct actions.

CNA is in a different jurisdictional boat. CNA is a contingent creditor of the postconfirmation estate. If a dentist insured by CNA becomes liable on a Patient Claim in a way that generates an indemnity or contribution right against the Debtors, CNA would claim by subrogation a right to recovery from the Liquidating Trust. The Settlement Agreement precludes that outcome.

CNA's potential claims have nexus with the postconfirmation estate and could affect that estate. The nexus is the National Union insurance policies. Unlike the direct action claimants, recovery by CNA as subrogee of a co-insured dentist would impact the amount of money in the trust and the distribution of that money to competing claimants. Related to jurisdiction to affect CNA's subrogation rights through the Settlement Agreement and injunction lies in the bankruptcy court. The fairness of CNA's treatment under the Settlement Agreement is measured differently.[31]

### C. Power: Statutory and Stern Considerations

#### 1. 11 U.S.C. § 105

The second step in *Greektown Holdings* is "whether [the court] ha[s] the power to enter the [bar] order." *Greektown Holdings, LLC*, 728 F.3d at 578. Other than observing that courts have answered the question "differently," the Sixth Circuit offered only that "the district court may discern

---

[31] See below.

some guidance from our previous holding that Bankruptcy Code § 524 does not prohibit a court from releasing a non-debtor from liability." *Greektown Holdings*, 728 F.3d at 578 (citing *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 657 (6th Cir. 2002)).

Long before *Greektown Holdings,* the Sixth Circuit held that bankruptcy courts have authority to grant injunctive relief against third parties that are liable with the debtor. *See American Imaging Servs., Inc. v. Eagle-Picher Indus. (In re Eagle-Picher Indus.)*, 963 F.2d 855, 858 (6th Cir. 1992); *see also Patton v. Bearden*, 8 F.3d 343 (6th Cir. 1993). Section 524 "limits the effect of a bankruptcy discharge, but does not bar parties from settling their claims, even if that settlement affects the rights of third parties." *Flake v. Schrader-Bridgeport Int'l, Inc.*, 538 F. App'x 604 (6th Cir. 2013) (citing *Food Lion, Inc. v. S.L. Nusbaum Ins. Agency, Inc.*, 202 F.3d 223 (4th Cir. 2000)); *see also In re Dow Corning Corp.*, 280 F.3d at 657; *In re City of Detroit*, 524 B.R. 147, 173 (Bankr. E.D. Mich. 2014).

While confirmation of a Chapter 11 plan may "somewhat" reduce bankruptcy court jurisdiction, nothing in Sixth Circuit decisions erodes the exercise of statutory authority within that jurisdiction. 11 U.S.C. § 105 grants power to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. *See, e.g.*, *Wasserman v. Immormino (In re Granger Garage, Inc.)*, 921 F.2d 74, 77 (6th Cir. 1990). Section 105 empowers the bankruptcy court to enter orders to implement a confirmed plan, especially when the plan expressly contemplates the postconfirmation action the court is asked to take.

### 2. *Stern*

*Greektown Holdings* addressed the conventional statutory authority question just discussed, but the Sixth Circuit apparently was not asked to consider constitutional authority under *Stern v.*

*Marshall.*[32] Insofar as a bankruptcy court must satisfy itself of constitutional authority,[33] the Settlement Agreement and a properly cabined injunction are not proscribed by *Stern.*

"Courts considering *Stern*'s reach have uniformly concluded that *Stern* had little impact on bankruptcy courts' authority to enter final orders and judgments on motions to approve a settlement pursuant to Bankruptcy Rule 9019, including those containing bar orders." *Realan Inv. Partners, LLLP v. Meininger (In re Land Resource, LLC)*, 505 B.R. 571, 580 (M.D. Fla. 2014). *See also Fox v. Picard (In re Madoff)*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012), *aff'd*, 740 F.3d 81 (2d Cir. 2014) (*Stern* dealt only with entry of a final judgment, and did not intrude on bankruptcy court authority to approve settlement agreements under Bankruptcy Rule 9019.); *Police & Fire Fin. Grp., Inc. v. Ambac Fin. Grp., Inc. (In re Ambac Fin. Grp., Inc.)*, No. 10–B–15973 (SCC), 2011 WL 6844533,

---

[32] __ U.S. __, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011). *See also Wellness Int'l Network, Ltd. v. Sharif*, ___ U.S. ___, 135 S. Ct. 1932, 191 L. Ed. 2d 911 (2015). There is no consent here of the sort discussed in *Wellness*. In his post hearing brief, Mustered makes a different constitutional argument. Mustered claims that the bankruptcy court cannot bind the minor victims of the Debtors' dental practices—not because of Article I/Article III concerns—but because notice is not effective absent appointment of a guardian ad litem. The notice proposed by the Liquidating Trustee in the Notice and Distribution Procedures Motion meets the requirements of due process. Notice of the actions proposed by the Liquidating Trustee must be communicated to present—both known and unknown—claimants so that they will have a full and fair opportunity to file claims against the proceeds. Known claimants of course must receive direct notice, and the motion so provides. As for unknown claimants, the Liquidating Trustee testified that the records of the Debtors that might have included some additional contact information are not available and that even if the records could be obtained, the datedness of the contact information would make it useless. The Liquidating Trustee has opted for an elaborate program of notice by publication. Due process requires that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their claims." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 657, 94 L. Ed. 865 (1950). *See also City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 296, 73 S. Ct. 299, 301, 97 L. Ed. 333 (1953) (applying *Mullane* due process requirements to bankruptcy cases). Here, the Liquidating Trustee has identified one or more newspapers of significant circulation in local markets in which Dental Clinics operated for at least six months. In addition to print media, many of these papers have online parallels, and notices will be posted there as well. Once notices are mailed and published, the Notice and Distribution Procedures Motion gives 90-days for the filing of claims against the Settlement fund.

[33] *See, e.g., Johnston v. City of Middletown (In re Johnston)*, 484 B.R. 698, 705 (Bankr. S.D. Ohio 2012) ("[F]ederal courts have an independent obligation to investigate and police the constitutional and statutory limits of their own jurisdiction."); *Harker v. Wells Fargo Bank, NA (In re Krause)*, 414 B.R. 243 (Bankr. S.D. Ohio 2009) ("The first and fundamental question presented by every case brought to the federal courts is whether the court has subject matter jurisdiction to hear the case before it, even when the parties concede or do not raise the issue.") (citing *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541, 106 S. Ct. 1326, 89 L. Ed. 2d 501 (1986)).

Case 3:12-bk-01573   Doc 863   Filed 10/09/15   Entered 10/09/15 11:43:22   Desc Main
Document    Page 21 of 40

*7 (S.D.N.Y. Dec. 29, 2011), *aff'd*, 487 F. App'x 663 (2d Cir. 2012) ("The full reach of *Stern* has yet to be determined, but it is clear that the case does not implicate the approval of settlements, relating to property of the debtor's estate, under Rule 9019. It suffices to note that there is a fundamental difference between a court's entry of a final, binding judgment on the merits of a claim and its approval of a settlement of that claim."); *In re ISE Corp.*, No. 10–14198 MM 11, 2012 WL 1377085, at *4 (Bankr. S.D. Cal. Apr. 13, 2012) ("*Stern* . . . and its narrow limit on bankruptcy court jurisdiction does not extend to the compromise and settlement of a claim which is 'indisputably property of a debtor's estate.'"); *In re Washington Mut., Inc.*, 461 B.R. 200, 213–17 (Bankr. D. Del. 2011) ("[A]pproval of settlements under Bankruptcy Rule 9019 by bankruptcy court's is firmly established.").

Reviewing this settlement does not offend *Stern.* The rights of third parties being settled are incidental to the valuation and liquidation of an asset of the estate and are incidental to the adjustment of claims against the Debtors. CNA, Mustered and the Former Owners all assert claims (some potential or hypothetical) against the Debtors and/or against the National Union policies. Those claims are resolved by the settlement. There are no counterclaims of the sort addressed in *Stern.* The bankruptcy court gets into *Stern* trouble only if the releases and injunction go beyond debtor/creditor relationships and beyond the incidental effects of valuing the insurance assets.

### D. Scope of the Bar Order, Releases and Injunction

*Greektown Holdings* said this about how to scrutinize a postconfirmation bar order or injunction:

> Other circuits have been careful to limit bar orders "to ensure that the only claims that are extinguished are claims where the injury is the non-settling defendant's liability to the plaintiffs" (i.e. claims for contribution or indemnity). *Gerber v. MTC*

*Elec. Techs. Co., Ltd.*, 329 F.3d 297, 307 (2d Cir. 2003) (Sotomayor, J.); *see also Lead Plaintiffs v. HealthSouth Corp. (In re HealthSouth Corp. Secs. Litig.)*, 572 F.3d 854, 863 (11th Cir. 2009) (noting that "the cases which have approved bar orders have involved orders that preclude claims by non-settling defendants against settling defendants where the injury to the non-settling defendant was its liability to the underlying plaintiffs"). . . .

In other words, "[c]ourts that have allowed bar orders have only barred claims in which the damages are measured by the defendant's liability to the plaintiff. Besides contribution and indemnity claims, these include any claims in which the injury is the nonsettling defendant's liability to the plaintiff." Significantly, "[n]o court has authorized barring claims with independent damages." This limitation makes sense because when the scope of a bar order is limited to claims for contribution or indemnity, the court can compensate the non-settling defendants for the loss of those claims by reducing any future judgment against them. *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 274 (2d Cir. 2006) ( "Ordinarily, the potential harshness of a bar order is mitigated by a judgment credit provision that protects a nonsettling party from paying damages exceeding its own liability."). A bar order that enjoins independent claims and provides no compensation is problematic to say the least.

*Greektown Holdings, LLC*, 728 F.3d at 579-80. See also *Official Comm. of Unsecured Creditors of Artra Group, Inc. v. Artra Group, Inc. (In re Artra Group, Inc.)*, 300 B.R. 699, 703 (Bankr. N.D. Ohio 2003) (Preconfirmation asbestos related injunction that would "bind every entity that might have any sort of claim whatsoever against [settling defendant], its insiders or subsidiaries if such claim is in anyway connected with [debtor] or its subsidiaries[]" was over broad and raised serious jurisdictional concerns.); *In re Arter & Hadden, LLP*, 373 B.R. 31 (Bankr. N.D. Ohio 2007) (Bar order that enjoins "any person" from bringing action against a nondebtor party is patently overbroad and beyond bankruptcy court jurisdiction).

This Settlement Agreement releases "truly independent claims." The injunction would bar a Former Owner from suing National Union for bad faith or for violation of nonbankruptcy consumer

protection laws—causes of action in which damages are not measured by claims against the Debtors. These provisions exceed what *Greektown Holdings* allows.[34]

### E. FED. R. BANKR. P. 9019 and McDannold

Before approving a settlement under Bankruptcy Rule 9019, the bankruptcy court must "apprise itself of all facts necessary to evaluate the settlement and make an informed and independent judgment as to whether the compromise is fair and equitable." *In re Bard,* 49 F. App'x at 530 (internal quotation and citation omitted). *Bard* sets out four factors: "(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises." *In re Bard*, 49 F. App'x at 530. "'A bankruptcy judge need not hold a mini-trial or write an extensive opinion every time he approves or disapproves a settlement. The [court] need only apprise [itself] of the relevant facts and law so that . . . an informed and intelligent decision [may be made], and set out the reasons for his decision." *Fishell v. Soltrow (In re Fishell)*, 47 F.3d 1168, 1995 WL 66622, at *3 (6th Cir. Feb. 16, 1995) (per curiam) (table decision) (*quoting LaSalle Nat'l Bank v. Holland (In re American Reserve Corp.)*, 841 F.2d 159, 163 (7th Cir. 1987)).

*McDannold* "fairness" is also at issue here because the contribution rights of nonsettling defendants would be extinguished. *Greektown Holdings* described fairness analysis under *McDannold*:

---

[34]  As discussed above, it could be argued that the bankruptcy court lacks jurisdiction, statutory authority or constitutional authority to approve an overly broad injunction. However, the bankruptcy court has jurisdiction (and authority) in the first instance to decide whether the bar order is too broad.

[I]n certain situations, a court must conduct a fairness hearing before imposing a bar order. Our court has held, outside the bankruptcy context, that when 'a settlement agreement contains a bar order extinguishing possible legal claims of non-settling defendants, the court must conduct an evidentiary fairness hearing to determine whether the settling defendants are paying their fair share of the liability.' But this rule only applies when the defendants share a common liability and the non-settling defendant's right of contribution against the settling defendant is extinguished by the bar order. If a court eliminates the non-settling defendant's contribution right and in exchange reduces any judgment against the non-settling defendant by the settlement amount, the court must ensure that the settling defendant pays its fair share of the plaintiff's damages.

*Greektown Holdings*, 728 F.3d at 576.

### 1. Probability of success

Only the Liquidating Trustee offered an opinion regarding the probability of success in the Coverage Case. Predictably, it was his opinion that many factors make success most uncertain. After extensive discovery, the Liquidating Trustee and National Union each legitimately believe the evidence supports their position. National Union has been "unwavering" that "the limits of the Entities Policies are nonexistent, or, at most, restricted to $6 million."[35]

If the Liquidating Trustee prevails in the Coverage Case, recovery under the policies then depends on proof of liability and damages in the underlying tort actions by Patient Claimants. Liquidation of those claims will likely include appeals and inter-defendant litigation that would delay recovery. To date, patient litigation has not resulted in any significant recoveries[36]—adding to the speculative nature of recovery in the Coverage Case.[37]

---

[35] Liquidating Trustee's Reply to the Objection of Danny Derose, Edward J. Derose, Michael A. Derose, William A. Mueller, Michael W. Roumph, Richard B. Lane and Adolph R. Padula to Motion of the Liquidating Trustee for Order (A) Approving Settlement with Insurers, (B) Granting an Injunction in Favor of the Insurers, and (C) Approving Trust Distribution Procedures, ECF Doc. 845, at 3.

[36] Affidavit of Paulyne A. Gardner-Smith in Support of Motion of the Liquidating Trustee, ECF Doc. 836.

[37] Lain Declaration, ECF Doc. 811-3.

Page 25 of 40

National Union's complaint in the Coverage Case alleges a massive failure by Small Smiles to disclose material information during the policy procurement process. Missing information included a history of sub-standard patient care, a broad government investigation concerning Medicaid fraud, claims against a prior insurer related to Medicaid fraud, nonrenewal by a former insurer based on claims experience, and pending Qui Tam actions alleging Small Smiles conspired to bill Medicaid for unnecessary dental procedures—all of which would have significantly impacted risk evaluation by National Union. The seriousness of these allegations is obvious. The factual contest in the Coverage Case is substantial.

### 2. Difficulties of collection

Success by the Liquidating Trustee in the Coverage Case would require National Union to perform under the policies. That National Union is able to perform has not been challenged.

### 3. Complexity, expense, inconvenience and delay

The complexity, expense and delay of litigating the Coverage Case would be significant. The Liquidating Trust legitimately fears running out of funds to defend[38] or prosecute its interests.

### 4. Interest of creditors and *McDannold* considerations

"Fairness" is at the heart of the fourth part of *Bard* review and of *McDannold* analysis. The objectors say the Settlement Agreement is not fair because it cuts off their rights under the policies and precludes direct actions against National Union.

Some of what the objectors label unfair is answered by nonbankruptcy law. An insurer in National Union's position can settle with one among multiple co-insureds for the policy limits and extinguish its contract obligations. *See, e.g.*, *Millers Mutual Ins. Ass'n of Ill. v. Shell Oil Co.*, 959

---

[38] The Liquidating Trust must also contend with ongoing patient litigation.

Case 3:12-bk-01573   Doc 863   Filed 10/09/15   Entered 10/09/15 11:43:22   Desc Main
Document      Page 26 of 40

S.W.2d 864, 869–71 (Mo. App. 1997) (Collecting cases and concluding that "[t]hese parties contracted for this insurance policy. The clause in question is unambiguous. . . . Had Shell desired additional language providing for a continuing duty to defend upon settlement for the policy limits on behalf of one insured, it could have required [the named insured] to obtain a different policy."); *Underwriters Guarantee Ins. Co. v. Nationwide Mut. Fire Ins. Co.*, 578 So.2d 34, 35 (Fla. App. 1991); *Country Mut. Ins. Co. v. Anderson*, 628 N.E.2d 499, 503–04 (Ill. App. 1993); *Anglo–American Ins. Co. v. Molin*, 670 A.2d 194, 199 (Pa. Cmwlth. 1995). It is not unfair for the Settlement Agreement to do what the contract[39] and state law allow outside of bankruptcy.

What would happen under state law[40] in a lawsuit by a Patient Claimant when a Small Smiles Clinic and a Former Owner are both defendants and insureds and National Union tenders policy limits in settlement of only the Clinic's liability? Could the Former Owner demand continuing defense by National Union? Almost assuredly, no, because National Union's obligation to defend ends at the limits of the policy. Could the patient continue the lawsuit against the Former Owner

---

[39]     The insurance policy admitted in evidence provides:

IV.  Limits of Insurance
    A. Subject to B. below, and regardless of the number of "claims" made or "suits" brought, the most we will pay for "damages" arising out of any one "dental incident" is the Limit of Insurance stated in the Declarations.  This limit shall apply separately:
        1.  To each individual dentist shown as a Named Insured in the Declarations as stated in Subparagraph A.1 of Section III., WHO IS AN INSURED; and
        2.  To all Named Insured and all additional insureds collectively, other than those subject to paragraph 1.,above.  This limit applies regardless of the number of insureds under the policy.
    B.  The most we will pay for the sum of all "damages" to which this insurance applies is the Limit of Insurance shown in the Declarations as Aggregate.

    Ex. 9, Attachment 1, National Union Fire Ins. Co. of Pittsburgh, PA, Dentists Liability Policy, No. DNU3375848.

[40] There are at least 22 states in which Small Smiles did business. A cursory look at nonbankruptcy law reveals that not all states reach precisely the same conclusions with respect to the rights of nonsettling defendants when an insurance company reaches a policy limits settlement with respect to one of multiple defendants.  At the hearing on the Settlement Agreement, all parties were invited to address choice of law. In response, all said, "it doesn't matter."

Case 3:12-bk-01573   Doc 863   Filed 10/09/15   Entered 10/09/15 11:43:22   Desc Main
Document      Page 27 of 40

notwithstanding settlement with the clinic? Almost assuredly, yes, subject to state law that would preclude "double recovery" for the same transgression—typically by a credit or setoff that would reduce any judgment against a nonsettling defendant by some or all of the amount paid from a settlement pool.

The Liquidating Trustee argues that "to the extent a Claimant recovers from the Liquidating Trust and then later brings a claim against [a Former Owner], [the Former Owner] will be entitled to seek a setoff to reduce their obligations by the amount the Claimant received from the Liquidating Trust."[41]  Similarly, the Liquidating Trustee states, "to the extent CNA is entitled to adequate protection for claims it may be subrogated to against the Dental Clinics or Clinic Dentists, CNA will receive a credit compensation for any amounts paid to the plaintiff, the Patient Related Claim holder. This result happens automatically under state law."[42]

These assurances by the Liquidating Trustee are not satisfying. There is no plan provision that requires the credit or setoff the Trustee describes. The Settlement Agreement acknowledges no such right. That state law may supply a credit rings hollow when no party responded to choice of law questions. Leaving credit rights to future litigation in an unknown court under unidentified state law is not fair. *Greektown Holdings* says that some type of credit is appropriate when contribution rights are impaired by a bankruptcy settlement.[43] This settlement offers none.

The releases and injunction that would bar direct actions against National Union also fail fairness review. Direct action claims are personal to the nonsettling defendants and not limited by

---

[41]  Liquidating Trustee's Reply to the Objection of Danny DeRose, Edward DeRose, Michael A. DeRose, William A. Mueller, Michael W. Roumph, Richard B. Lane, and Adolph R. Padula, ECF Doc. 845, at 6.

[42]  Liquidating Trustee's Post-hearing Memorandum in Support of the Motion, ECF Doc. 859, at 14.

[43]  *Greektown Holdings,* 728 F.3d at 579.

National Union's tender of policy limits to the Liquidating Trust. There was no proof of compensation for the loss of direct action rights. Even if there was a bump in the dollar amount of the settlement because of the bar to direct actions, that extra money goes to Patient Claimants, not to Former Owners. In the absence of any credit feature, it can't be said that Former Owners receive even indirect benefit from the release of direct actions.

## V. CONCLUSION

When reviewing a contested settlement: "A perfect deal is not required, but rather one that yields some benefit for all, while at the same time extracting relatively equal measures of pain. This is the art. The battle ends, while all may still walk from the field. That's the wisdom."[44] $39,000,000 for the benefit of Small Smiles Patient Claimants is no small amount. The proposed notice and claims processing procedures will appropriately identify and pay Patient Claims sparing everyone years of uncertain litigation. The Settlement Agreement fails review under *Greektown Holdings* only because the credit rights of nonsettling defendants are not addressed and the bar to direct actions exceeds the limits of Sixth Circuit law.

---

[44] *In re LPN Healthcare Facility Inc.,* 531 B.R. 730, 735 (Bankr. S.D. Ohio 2015).

Case 3:12-bk-01573    Doc 863    Filed 10/09/15    Entered 10/09/15 11:43:22    Desc Main
Document    Page 29 of 40

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

In re:

CS DIP, LLC (f/k/a Church Street Health
Management, LLC), SSHC DIP, LLC (f/k/a
Small Smiles Holding Company, LLC), and
FNY DIP, LLC (f/k/a FORBA NY, LLC),

*Debtors.*

Case No. 3:12-bk-01573
Case No. 3:12-bk-01574
Case No. 3:12-bk-01575

(Jointly administered under
Case No. 12-01573)

Chapter 11
Hon. Keith M. Lundin

## APPENDIX A

**Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code
Proposed by Debtors and the Official Committee of Unsecured Creditors, ECF Doc. 647-1, at
15-20.**

> *4.17 Class 5(a): Patient-Related Claims against CS DIP, LLC; SSHC DIP, LLC;
> FNY DIP, LLC and all related claims against other Entities*

> \* \* \*

> (c) <u>Liquidation</u>**.** Unless and until the Liquidating Trust adopts and implements a
> Claim Approval Structure and/or Claim Distribution Procedures pursuant to the Plan
> and the Liquidating Trust Agreement, all holders of Class 5(a) Claims will be entitled
> to initiate and prosecute their Claims without restriction in the tort system. To the
> extent the automatic stay in these cases or any other limitation imposed by these
> cases would limit any such action, such automatic stay or limitation will be lifted
> thirty (30) days after the Effective Date of the Plan. Nothing herein shall obligate the
> Liquidating Trust or the Liquidating Trustee to defend any such Claims. The
> Liquidating Trust and Liquidating Trustee will, however, cooperate with and assist
> the Insurance Carriers in defending such Claims, whether brought against the
> Debtors, Post-Confirmation Debtors, Dentists or Clinics, to the extent required under
> the terms of the applicable Insurance Policies.

Page 30 of 40

(d) <u>Insurance</u>. The Liquidating Trust shall be entitled to exercise and enforce all of the Insurance Rights and obligations of the Debtors, Post-Confirmation Debtors or other insureds, under or related to the Insurance Policies, including directing the Debtors' or Post-Confirmation Debtors' litigation of the Coverage Litigation. The Liquidating Trust will perform or cause the Debtors or Post-Confirmation Debtors to perform, such obligations, if any, required by the Insurance Policies (for example, by providing any required notice of Claims to the Insurance Carrier) to preserve the Insurance Rights to the fullest extent possible. The Liquidating Trust will have the rights as described in this Plan and in the Trust Agreement related to the pursuit, settlement, and resolution of such insurance coverage rights. All holders of Class 5(a) Claims are deemed to grant to the Liquidating Trust the right and power to bind them to a settlement of Insurance Rights and the related limitations on their Class 5(a) Claims as described in the following subsection of the Plan, and subject to the limitations set forth in that subsection.**

(e) <u>Settlement of Coverage Claims</u>. In connection with any resolution of Insurance Rights, the Liquidating Trust shall have the right, subject to approval by the Trust Advisory Committee and the approval of the Bankruptcy Court after notice and hearing, to compromise, settle, and release any and all claims or potential claims by any (i) Class 5(a) claimant, (ii) Dentist, (iii) Clinic, or other Entity against an Insurance Carrier related to Class 5(a) claims, including any claim that any of the foregoing might have for indemnification or defense from any Insurance Carrier, subject in all events to the following restrictions:

i. No such settlement shall affect, impair or otherwise alter any payment made by any Insurance Carrier related to any Class 5(a) claim prior to the effective date of such settlement without the express written consent of the beneficiary of such payment.

ii. To the extent that that Liquidating Trust compromises, settles or releases any claims or potential claims by any Dentists or Clinics pursuant to the authority granted herein (including the release of any Insurance Rights that benefit such Dentist or Clinic), the terms of such compromise, settlement or release must provide that any remaining claims against such Dentist or Clinics by any holder of a Class 5(a) Claim will become non-recourse with respect to such Dentist or Clinics, and that holders of such Class 5(a) Claims who have or might have claims against such Dentist or Clinics will be entitled to recovery only from the Liquidating Trust assets as provided in the Liquidating Trust Agreement and/or any Insurance Carriers that are not parties to such compromise, settlement or release.

iii. In no event will the Liquidating Trust have the right or power under the terms of this Plan to release any insurance coverage that might provide defense or

Case 3:12-bk-01573   Doc 863   Filed 10/09/15   Entered 10/09/15 11:43:22   Desc Main
                    Document      Page 31 of 40

indemnity rights to Danny DeRose, Edward DeRose, Michael DeRose, William Mueller, or Adolph Padula for any claims that arise in whole or in part out of the circumstances that give rise to the Class 5(a) Claims, without the unanimous approval of the Trust Advisory Committee.

iv. If the Liquidating Trust and Post-Confirmation Debtors determine (subject to approval by the Trust Advisory Committee) that they will not exercise the rights and powers described in Section 4.18(c) below with respect to any Dentist, then the Liquidating Trust promptly shall notify that Dentist of its determination and grant back to that Dentist the rights and powers described in Section 4.18(c) with respect to that Dentist. Any such reversion will not affect the grant of rights and powers described in this Section 4.17(e) or in Section 4.18(c) with respect to any Dentist that is not expressly identified in the Liquidating Trust's notice provided pursuant to this Section 4.17(e)(iv) or Section 4.18(c).

v. In the event that any other Insurance Carrier holds subrogation rights in a Claim to be compromised hereunder, nothing contained herein shall preclude, limit or otherwise alter such Insurance Carrier's right to notice and an opportunity to object to the proposed settlement on any basis for objection under applicable fact or law.

(f) Distributions. Each Class 5 (a) claimant will be deemed to have been issued a Patient Interest in the Liquidating Trust on the Effective Date, subject to the terms of the Liquidating Trust Agreement and subject to any Claim Approval Structure and/or Claim Distribution Procedures that may subsequently be approved. Holders of Patient-Related Claims will receive no monetary distribution from the Debtors' estates or based upon their Patient Interests (other than as set forth in Section 4.17(g) of the Plan or as may be deemed a distribution for tax purposes under Section 5.3(e) of the Plan) unless and until the Liquidating Trust establishes a Claim Approval Structure or Claim Distribution Procedures in accordance with Section 4.17(g) of the Plan and the Liquidating Trust Agreement. The Debtors purchased or facilitated the Dentist's purchase of the Insurance Policies that were intended to protect the Debtors, the Clinics and the Dentists from patient claims arising from dental services provided by or under the management of the Debtors, the Clinics, or the Dentists. The Plan provides the Liquidating Trust the Insurance Rights, including the rights and powers to prosecute and defend litigation that is intended to maintain and establish the rights to coverage under the Insurance Policies that the Debtor believes should respond to patient claims that have been or may be asserted against the Debtors, the Clinics, or the Dentists. Preservation of this insurance coverage provides Class 5(a) Claimants their greatest likelihood of meaningful recovery.

(g) Establishment of Claim Approval Structure or Claim Distribution Procedures. Pursuant to the Liquidating Trust Agreement, the Liquidating Trustee may,

Case 3:12-bk-01573   Doc 863   Filed 10/09/15   Entered 10/09/15 11:43:22   Desc Main
Document   Page 32 of 40

subsequent to the Effective Date, implement a structure for the submission, review and allowance of Class 5(a) Claims, and/or for the procedures for distribution from the Liquidating Trust to holders of Allowed Class 5(a) Claims. Any Claim Approval Structure and/or Claim Distribution Procedures shall be binding upon and will govern distributions to all Class 5(a) Claim holders whose Claims are unsatisfied at the time of establishment of the structure or procedures, and will provide the exclusive remedy to all holders of unsatisfied Class 5(a) Claims. Any such Claim Approval Structure and/or Claim Distribution Procedures shall require approval by the Trustee Advisory Committee, and by the Bankruptcy Court (after notice and hearing) and be subject to such other approvals as provided for in the Liquidating Trust Agreement. Any monetary distribution to the holders of Patient Interests will be determined and paid in accordance with the approved Claim Approval Structure and/or Claim Distribution Procedures and the Liquidating Trust Agreement. No Claim Approval Structure and/or Claim Distribution Procedure that would apply to any claim that the Liquidating Trust asserts is covered by National Union Fire Insurance Company of Pittsburgh, PA ("National Union") shall be proposed to the Bankruptcy Court or implemented without the consent of National Union, unless and until (i) there has been a settlement between the Liquidating Trust and National Union that is effective, or a Final Order in any Court, that resolves all coverage issues pertaining to such claim, or (ii) National Union declines to defend such claim. Without National Union's consent, neither the Liquidating Trust nor any holder of a Patient-Related Claim may assert that: (x) any Claim Approval Structure and/or Claim Distribution Procedures and/or any individual settlement between the Liquidating Trust and the holder of a Patient-Related Claim, nor claim amounts allowed thereunder, establishes liability of National Union or serves as the basis for any claim for insurance coverage against National Union in any Court, or (y) the Claim Approval Structure and/or amounts determined thereunder and/or any individual settlement between the Liquidating Trust and the holder of a Patient-Related Claim are relevant to, or may serve as evidence with respect to, amounts to be paid by National Union under any Insurance Policy.

(h) <u>Claims Against Former Affiliates</u>. Each holder of a Class 5(a) Claim will retain any and all claims and legal rights such holder may have against any of Danny DeRose, Edward DeRose, Michael DeRose, William Mueller, or Adolph Padula. All holder of Class 5(a) Claims will be entitled to initiate and prosecute any such claim against any or all of Danny DeRose, Edward DeRose, Michael DeRose, William Mueller, or Adolph Padula without restriction in the tort system. To the extent the automatic stay in these Chapter 11 Cases or any other limitation imposed by these Chapter 11 Cases would limit any such action, such automatic stay or limitation will be lifted thirty (30) days after the Effective Date of the Plan.

### 4.18. Class 5(b): Dentist's Contribution or Indemnity Claims

* * *

(b) <u>Distributions / Treatment</u>. Holders of Dentist's Contribution or Indemnity Claims will receive no distribution from the Debtors' estates. The Debtors purchased or facilitated the Dentists' purchase of the Insurance Policies, which includes certain insurance coverage that was intended to protect the Dentists from patient claims arising from dental services provided by the Dentists while in the employ of one or more of the Debtors or the Clinics. Pursuant to the Plan, the Debtors have facilitated the establishment of the Liquidating Trust. The Plan provides the Liquidating Trust the rights and powers to prosecute and defend litigation that is intended to maintain, establish and enforce the Insurance Rights, including the rights to coverage under the insurance policies that the Debtor or Post-Confirmation Debtors believe should respond to patient claims that have been or may be asserted against the Dentists. Notwithstanding the foregoing, nothing contained herein shall be deemed to limit, waive or impair any right that a Holder of a Dentist's Contribution or Indemnity Claims has to assert such Claim as a defense to any Cause of Action brought against such Holder by the Debtors, the Post-Confirmation Debtors or the Liquidating Trustee.

(c) <u>Right to Settle or Release Dentists' claims to insurance coverage or potential coverage.</u> To facilitate the Liquidating Trust's management of the Insurance Policies that may respond to Patient-Related Claims and against the Dentists based on similar circumstances, the Dentists do on the Effective Date irrecoverably grant the Liquidating Trust and/or the Post-Confirmation Debtors the right and power (subject to approval by the Trust Advisory Committee and the approval of the Bankruptcy Court after notice and a hearing) to compromise, settle, release and receive the proceeds of any and all claims that the Dentists may have against any or all Insurance Carriers, subject in all events to the following restrictions:

i. To the extent that that Liquidating Trust and/or Post-Confirmation Debtors compromises, settles or releases any claims or potential claims by any Dentist pursuant to the authority granted herein (including the release of any Insurance Rights that benefit such Dentist), the terms of such compromise, settlement or release must have been asserted) against such Dentist by any and all holders of Class 5(a) Claims (whether or not such claims have been asserted) will become non-recourse with respect to such Dentist and his/her personal assets, and that holders of such Class 5(a) Claims who have or might have claims against such Dentist will be entitled to recovery only from the Liquidating Trust assets as provided in the Liquidating Trust Agreement and/or any Insurance Carriers that are not parties to such compromise, settlement or release, and such non-recourse treatment shall be embodied in a final, non-appealable order of the Bankruptcy Court or another court of competent jurisdiction.

ii. To the extent that the potential insurance released by the Liquidating Trust and/or Post-Confirmation Debtors was limited to claims arising from dental services performed within a specific time period, the non-recourse limitation afforded Dentists as a result may be limited to patients who may assert claims arising in whole or in part from services performed within that same time period.

iii. The Dentists whose claims may be compromised, settled or released pursuant to the authority granted herein will be parties entitled to notice of and an opportunity to be heard on any motion seeking approval of such an agreement, subject to any notice procedures approved by the Bankruptcy Court.

iv. If the Liquidating Trust and Post-Confirmation Debtors determine (subject to approval by the Trust Advisory Committee) that they will not exercise the rights and powers described in Section 4.18(c) above with respect to any Dentist, then the Liquidating Trust promptly shall notify that Dentist of its determination and grant back to that Dentist the rights and powers described in Section 4.18(c) with respect to that Dentist. Any such reversion will not affect the grant of rights and powers described in Section 4.18(c) above with respect to any Dentist that is not expressly identified in the Liquidating Trust's notice provided pursuant to this Section 4.18(c)(iv).

v. In the event that any other Insurance Carrier holds subrogation rights in a Claim to be compromised hereunder, nothing contained herein shall preclude, limit or otherwise alter such Insurance Carrier's right to notice and an opportunity to object to the proposed settlement on any basis for objection under applicable fact or law.

*4.19. Class 5(c) Clinic's Contribution or Indemnity Claims (a) Impairment and Voting.*
* * *

(b) Distributions / Treatment. Holders of Clinic's Contribution or Indemnity Claims will receive no distribution from the Debtors' estates. The Debtors purchased the Insurance Policies, which include certain insurance coverage that was intended to protect the Clinics from patient claims arising from dental services provided by the Clinics subject to management by one or more of the Debtors. Pursuant to the Plan, the Debtors have facilitated the establishment of the Liquidating Trust. The Plan will give the Liquidating Trust the rights and powers to prosecute and defend litigation that is intended to maintain, establish and enforce rights to coverage under the insurance policies that the Debtors or Post-Confirmation Debtors believe should respond to patient claims that have been or may be asserted against the Clinics. Notwithstanding the foregoing, that nothing contained herein shall be deemed to limit, waive or impair any right that a Holder of a Clinic's Contribution or Indemnity

Claims has to assert such claim as a defense to any Cause of Action brought against such Holder by the Debtors, the Post-Confirmation Debtors or the Liquidating Trustee.

(c) <u>Right to Settle or Release Clinic's claims to insurance coverage or potential coverage</u>. To facilitate the Liquidating Trust's management of the Insurance Policies that may respond to Patient-Related Claims and claims against the Clinics based on similar circumstances, the Clinics do on the Effective Date irrecoverably grant the Liquidating Trust and/or Post-Confirmation Debtors the right and power (subject to approval by the Trust Advisory Committee and the approval of the Bankruptcy Court after notice and a hearing) to compromise, settle, release, and receive the proceeds of any and all claims that the Clinics may have against any or all Insurance Carriers, subject in all events to the following restrictions:

i. To the extent that that Liquidating Trust and/or Post-Confirmation Debtors compromises, settles or releases any claims or potential claims by any Clinic pursuant to the authority granted herein (including the release of any Insurance Rights that benefit such Clinic), the terms of such compromise, settlement or release must provide that any remaining claims or potential claims (whether or not such claims have been asserted) against such Clinic by any and all holders of Class 5(a) Claims (whether or not such claims have been asserted) will become non-recourse with respect to such Clinic and its assets, and that holders of such Class 5(a) Claims who have or might have claims against such Clinic will be entitled to recovery only from the Liquidating Trust assets as provided in the Liquidating Trust Agreement and/or any Insurance Carriers that are not parties to such compromise, settlement or release, and such nonrecourse treatment shall be embodied in a final, non-appealable order of the Bankruptcy Court or another court of competent jurisdiction.

ii. To the extent that the potential insurance released by the Liquidating Trust and/or Post-Confirmation Debtors was limited to claims arising from dental services performed within a specific time period, the non-recourse limitation afforded Clinics as a result may be limited to patients who may assert claims arising in whole or in part from services performed within that same time period.

iii. The Clinics whose claims may be compromised, settled or released pursuant to the authority granted herein will be parties entitled to notice of any motion seeking approval of such an agreement, subject to any notice procedures approved by the Bankruptcy Court.

Case 3:12-bk-01573   Doc 863   Filed 10/09/15   Entered 10/09/15 11:43:22   Desc Main
Document    Page 36 of 40

In re:

CS DIP, LLC (f/k/a Church Street Health
Management, LLC), SSHC DIP, LLC (f/k/a
Small Smiles Holding Company, LLC), and
FNY DIP, LLC (f/k/a FORBA NY, LLC),

*Debtors.*

Case No. 3:12-bk-01573
Case No. 3:12-bk-01574
Case No. 3:12-bk-01575

(Jointly administered under
Case No. 12-01573)

Chapter 11
Hon. Keith M. Lundin

## APPENDIX B

Settlement and Release Agreement, at xii-xiv, ECF Doc. 811-1.

### Section III    Payment of the Settlement Amount

C.    Upon payment by the Insurers of the Settlement Amount and regardless of any subsequent events: (1) all provisions of this Agreement shall be final and binding; (2) the Entities Policies are exhausted by payment of the Settlement Amount, which is in excess of the full amount of the aggregate coverage limits of all the Entities Policies combined; (3) each of the SSHC Policies shall be deemed to be bought-out by the Insurers, subject to a free and clear sale pursuant to the Plan and/or Section 363 of the Bankruptcy Code, as applicable; (4) the Insureds and Claimants shall each be deemed to have released the Insurers from any further payment obligations under the SSHC Policies; (5) any claims for coverage relating to the Small Smiles Claims under the Non-SSHC Policies shall be deemed to be bought-out by the Insurers, subject to a free and clear sale pursuant to the Plan and/or Section 363 of the Bankruptcy Code, as applicable; and (6) the Clinic Dentists and Claimants shall each be deemed to have released the Insurers from any further payment obligations under the Non-SSHC Policies for any claims for coverage relating to the Small Smiles Claims. The Parties further agree that the foregoing shall be expressly incorporated in the Approval Order.

**Section VI  Releases**

A. Upon payment of the Settlement Amount, and without any further action by the Parties, the Liquidating Trustee, on behalf of the Liquidating Trust and Small Smiles, hereby fully, finally and completely, remises, releases, acquits and forever discharges the Insurers and Affinity of and from the Settled Claims. In connection with the foregoing, the Liquidating Trustee intends to and does hereby grant the broadest possible release and other relief to the Insurers, their respective insureds and Affinity with respect to all such claims that the Liquidating Trustee has the authority to grant under the Plan.

B. The Liquidating Trustee does, pursuant to this Agreement, exercise the rights granted under Section 4.17(d) of the Plan to provide and require that all remaining Small Smiles Claims against the Insureds and the Clinic Dentists shall, immediately upon payment of the Settlement Amount, become non-recourse as to the Insureds and Clinic Dentists who provide a sworn statement that they in good faith believe they have or had a right to coverage under any of the Policies. The holders of any Small Smiles Claims that are made non-recourse pursuant to the preceding sentence shall be entitled to recovery only from the assets of the Liquidating Trust as provided in the Trust Distribution Procedures and/or insurance companies other than the Insurers and related to policies of insurance other than the Policies.

C. Nothing in this Section VI or any other provision of this Agreement is intended to, nor shall it be construed to, have any effect on, or constitute a release, waiver, assignment or discharge of, the Insurers' rights or Claims for reinsurance in connection with the Policies and/or the Settled Claims, if any, all of which are expressly reserved by the Insurers.

D. Nothing in this Section VI or any other provision of this Agreement is intended to, nor shall it be construed to, have any effect on, or constitute a release, waiver or discharge of, the Parties' respective rights, obligations, remedies or Claims created under this Agreement.

E. Nothing in this Section VI or any other provision of this Agreement is intended to, nor shall it be construed to, have any effect on, or constitute a release, waiver or discharge of, the Insurers' obligations to defense counsel or other parties for any amounts incurred at the Insurers' direction in connection with the defense provided by the Insurers of Small Smiles Claims asserted against the Insureds.

F. Nothing in this Section VI or any other provision of this Agreement is intended to, nor shall it be construed to, have any effect on, or constitute a release, waiver, assignment or discharge of, Claimants' Claims or causes of action against FORBA LLC, FORBA NY LLC, DeRose Management Company, DD Marketing, Inc., Danny

Case 3:12-bk-01573   Doc 863   Filed 10/09/15   Entered 10/09/15 11:43:22   Desc Main
Document    Page 38 of 40

DeRose, Edward DeRose, Michael DeRose, William Mueller, Michael Roumph, Richard Lane or Adolph Padula.

G. The Parties hereto acknowledge that they are aware that they may hereafter discover facts different from or in addition to those they now know or believe to be true with respect to the Small Smiles Claims, causes of action, rights, obligations and liabilities herein released, and each agrees that the within release shall be and remain in effect in all respects as a complete release as to all matters released herein, notwithstanding any such different or additional facts.

**Proposed Order (A) Approving Settlement with National Union Fire Insurance Company of Pittsburgh, PA., (B) Granting Injunction, and (C) Approving of Trust Distribution Procedures, ¶¶ 6-10. ECF Doc. 811-4.**

6.  As provided in the Agreement, upon payment by the Insurers of the Settlement Amount and regardless of any subsequent events: (1) all provisions of the Agreement will be final and binding; (2) the Entities Policies are exhausted by payment of the Settlement Amount, which is in excess of the full amount of the aggregate coverage limits of all the Entities Policies combined; (3) each of the SSHC Policies are deemed to be bought-out by the Insurers free and clear of all other interests pursuant to the Plan and/or Section 363 of the Bankruptcy Code, as applicable; (4) the Insureds and Claimants are each deemed to have released the Insurers from any further payment obligations under the SSHC Policies; (5) any claims for coverage relating to the Small Smiles Claims under the Non-SSHC Policies are deemed to be bought out by the Insurers free and clear of all interests pursuant to the Plan and/or Section 363 of the Bankruptcy Code, as applicable; and (6) the Clinic Dentists and Claimants are each deemed to have released the Insurers from any further payment obligations under the Non-SSHC Policies for any claims for coverage relating to the Small Smiles Claims.

\* \* \*

8. Upon payment of the Settlement Amount by the Insurers, all Persons are hereby permanently and forever barred, estopped and enjoined from asserting against the Insurers any Settled Claims, in any way whatsoever, whether known or unknown, whether foreseen or unforeseen, whether contingent or actual, whether direct or indirect, liquidated or unliquidated, whether statutory or common law, whether asserted or unasserted and whether based on contract, negligence, bad faith, willful, wanton or malicious conduct, or any other theory in law or equity concerning, arising from or relating to any actual or alleged past, present or future act, omission, defect,

Page 39 of 40

incident, event or circumstance from the beginning of the world to the Effective Date, including but not limited to claims for contribution or indemnity, in any way relating to or in connection with (i) the Debtors, (ii) any dental treatment rendered or failed to be rendered at any of the dental clinics that was under or is claimed to have been under a management agreement with the Debtors during the effective dates of the SSHC Policies and/or is scheduled as an insured, named insured or additional insured under any of the Policies, (iii) the Agreement and/or the Policies.

9. Upon the sale to the Insurers of the SSHC Policies and of any claim for coverage relating to the Small Smiles Claims under the Non-SSHC Policies, no Person may assert any claim of any kind against the Insurers arising from or relating thereto.

10. Upon payment of the Settlement Amount, all releases set forth in the Agreement are approved and shall be permanent.

This Order has been electronically
signed.  The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.